**REL:09/19/2014**

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

SPECIAL TERM, 2014

_____

1111422

_____

Cadence Bank, N.A.

v.

Goodall-Brown Associates, L.P.

_____

1111449

_____

Sloss Real Estate Group, Inc., et al.

v.

Goodall-Brown Associates, L.P.

_____

1111526

_____

**Ex parte Sloss Real Estate Group, Inc., et al.**

**PETITION FOR WRIT OF MANDAMUS**

**(In re:  Goodall-Brown Associates, L.P.**

**v.**

**Sloss Real Estate Group, Inc., et al.)**

————————————————

**1121455**

————————————————

**Second Avenue Holdings, LLC**

**v.**

**Goodall-Brown Associates, L.P.**

————————————————

**1130054**

————————————————

**Second Avenue Holdings, LLC**

**v.**

**Goodall-Brown Associates, L.P.**

**Appellate proceedings from Jefferson Circuit Court**
**(CV-12-900435 and CV-10-903160)**

SHAW, Justice.

These consolidated appeals and petition for a writ of mandamus arise out of litigation pending in the Jefferson Circuit Court stemming from the alleged breach of a lease

agreement, which litigation was originally initiated by Goodall-Brown Associates, L.P. ("Goodall-Brown"), the lessor. Following the entry of an order compelling the matter to arbitration, the defendants below, Sloss Real Estate Group, Inc. ("SREG"), the lessee; Sloss Goodall-Brown, LLC ("Sloss Goodall"), the assignee of SREG; Cadence Bank, N.A. ("Cadence"), and Second Avenue Holdings, LLC ("Second Avenue"), the successors in interest to Goodall-Brown's original mortgage lender; and Leigh Ferguson, Catherine S. Crenshaw, Jack Peterson, A. Page Sloss, Jr., Ronald J. Capello, and Vicki H. Bolton (hereinafter collectively referred to as "the individual defendants"), and Sloss Real Estate Company ("SREC"), the alleged alter ego of the individual defendants in conjunction with SREG and Sloss Goodall (the individual defendants, SREG, SREC, and Sloss Goodall are sometimes hereinafter collectively referred to as "the Sloss defendants"), unsuccessfully sought dismissal of Goodall-Brown's claims based on the trial court's alleged lack of subject-matter jurisdiction to order the matter to arbitration because, they argued, Goodall-Brown lacked standing to assert the claims.

3

1111422; 1111449; 1111526; 1121455; 1130054

In case no. 1111422, Cadence appeals from the trial court's order effectively compelling it to arbitration. In case no. 1111449, the Sloss defendants renew their contention that the trial court lacked the requisite subject-matter jurisdiction to compel the parties to arbitration. Alternatively, in case no. 1111526, the Sloss defendants petition this Court for a writ of mandamus directing the trial court to void its order compelling the matter to arbitration and to dismiss the underlying action based on Goodall-Brown's alleged lack of standing and that court's resulting lack of subject-matter jurisdiction. In case no. 1121455 and case no. 1130054, Second Avenue appeals from the trial court's denial of its request to enjoin discovery in the arbitration proceeding ordered by that court as to Second Avenue, pending resolution of the above-captioned appeals and petition. At the request of the parties, we have consolidated these matters for the purpose of writing one opinion.[1] For the reasons stated below, in case no. 1111422, we affirm; in case no.

_____

[1]The final two appeals in these consolidated matters were submitted for review on April 23, 2014, thus allowing us to consider all the appeals and the petition for a writ of mandamus together.

4

1111422; 1111449; 1111526; 1121455; 1130054

1111526, we deny the petition; and we dismiss the appeals in cases nos. 1111449, 1121455, and 1130054.

<u>Facts and Procedural History</u>

Goodall-Brown is an Alabama limited partnership; it owns a parcel of real property located in downtown Birmingham, which is commonly referred to as the "Goodall-Brown Building." In 2001, Goodall-Brown obtained from a lender called "The Bank" a $2,975,000 construction loan, evidenced by a note, to finance planned renovations to the Goodall-Brown Building. In connection with that loan, Goodall-Brown executed a "Future Advance Mortgage, Assignment of Rents and Leases and Security Agreement" assigning to The Bank as security, among other collateral, the Goodall-Brown Building, all future rents and revenues from the Goodall-Brown Building, and "all leases, subleases, and lease guaranties" relating to the Goodall-Brown Building. The loan documents were executed on Goodall-Brown's behalf by Roy Thomas Latimer, Jr., the managing member of Goodall-Brown Management, L.L.C. ("GBM"), an Alabama limited-liability company that was a general partner in Goodall-Brown.

1111422; 1111449; 1111526; 1121455; 1130054

Additionally, Latimer personally guaranteed repayment of the note.[2]

In October 2005, SREG entered into a "Master Lease" agreement ("the lease") with Goodall-Brown pursuant to which SREG leased from Goodall-Brown space in the Goodall-Brown Building. The lease specifically provided that future disputes among the parties would be submitted to arbitration.[3] As permitted by the terms of the lease, and with Goodall-Brown's consent, in December 2005, SREG purported to assign

---

[2]The record reflects that, in addition to Latimer, Adam S. Cohen and Stacey C. Dulin, the other members of GBM at that time, were also initially guarantors of the indebtedness; however, all guarantors excepting Latimer were subsequently released from their guarantees.

[3]The pertinent provision provides, in full:

"13.1.2.2    Arbitration. Any Dispute, which remains unresolved at the end of [the] thirty (30) day [informal-negotiation] period [provided for in section 13.1.2.1 of the lease], shall be submitted to binding arbitration in accordance with Chapter I, Title 9 of the United States Code (Federal Arbitration Act). Arbitration shall be administered by the American Arbitration Association ('AAA') in accordance with its Commercial Arbitration Rules as supplemented by its Supplementary Procedures for Complex Cases."

Pursuant to a preceding paragraph in the same document, namely section 13.1.2, the referenced "Dispute[s]" subject to arbitration include "any and all such disputes of any nature whatsoever."

its rights under the lease to Sloss Goodall,[4] which was wholly owned by SREG.

The Bank's interest in the Goodall-Brown note and mortgage was later assigned by the Federal Deposit Insurance Corporation ("the FDIC"), as receiver of and legal successor to The Bank, to Superior Bank ("Superior"). In 2006, Superior and SREG entered into a "Subordination, Non-Disturbance and Attornment Agreement" ("the attornment agreement")[5] pursuant to which they agreed, among other things, that SREG would not be added as a party to any foreclosure proceedings that Superior might initiate against Goodall-Brown; that, in the event Superior should succeed Goodall-Brown as owner of the Goodall-Brown Building, the lease would remain in effect; and that Superior was entitled to exercise the same remedies in relation to a breach as were afforded Goodall-Brown under the lease.

---

[4]There is some indication in the record that, at the time of the purported assignment, Sloss Goodall had not yet been properly organized; in fact, it appears that Sloss Goodall was not legally formed until December 8, 2009. However, no party raises any challenge to the validity of the lease assignment on that ground.

[5]This agreement specifically identified Superior as "mortgagee," SREG as "lessee," and Goodall-Brown as "owner."

7

1111422; 1111449; 1111526; 1121455; 1130054

The record further reflects that, in July 2010, Goodall-Brown provided notice to Sloss Goodall via certified mail that it was terminating the lease as a result of the alleged continuing default of Sloss Goodall.[6]  In August 2010, Superior and Goodall-Brown executed an agreement called the "Eighth Amendment to Loan Documents And Forbearance Agreement."  This agreement, among other things, acknowledged that there had been a default under the lease.

In September 2010, Goodall-Brown sued SREG and Sloss Goodall in the trial court asserting various claims and seeking to terminate the lease and requesting damages related to Sloss Goodall's alleged breach (case no. CV-10-903160).  In response, both SREG and Sloss Goodall moved to dismiss case no. CV-10-903160 or to compel arbitration of the claims asserted therein, pursuant to the lease.

In the interim, Latimer filed for Chapter 11 bankruptcy protection in January 2011; his case was later converted to a proceeding under Chapter 7 of the Bankruptcy Code.  According

---

[6]Pursuant to the notice, the lease and Sloss Goodall's tenancy were to terminate 10 days following service of the notice, which was, according to the record, effected July 21, 2010.

8

1111422; 1111449; 1111526; 1121455; 1130054

to the pleadings from the bankruptcy court, Latimer was identified in that proceeding as the sole debtor.

In April 2011, the FDIC seized Superior and transferred its assets to a bank of the same name, i.e., Superior Bank, N.A. ("Superior II"). After the addition of other parties and claims in case no. CV-10-903160,[7] and upon the agreement of all parties, the trial court, on June 24, 2011, entered an order  jointly proposed by the parties staying the action as to  certain parties but requiring that the claims between Goodall-Brown and SREG and Sloss Goodall proceed to arbitration, where they remain pending.  No party appealed from that order.

In July 2011, Superior II notified Goodall-Brown of Goodall-Brown's default on the note secured by the Goodall-Brown Building.  Thereafter, as a result of Goodall-Brown's continued default, Superior II accelerated the indebtedness,

---

[7]Goodall-Brown subsequently amended its original complaint to add claims against fictitiously named defendants; against SREC, the incorporating member of Sloss Goodall; and against the individual defendants.  The individual defendants comprise the membership and/or management of SREG, Sloss Goodall, and SREC.  Goodall-Brown added the additional defendants based on its belief that SREG both fraudulently formed Sloss Goodall and induced Goodall-Brown to agree to the assignment of the lease to what it refers to as a "sham" corporation.

undertook efforts to seize rents due from tenants of the Goodall Brown Building, and initiated foreclosure proceedings on the Goodall-Brown Building. In October 2011, however, before completing the scheduled foreclosure, Superior II sold the note and assigned all of its interest therein to Second Avenue.[8] In November 2011, Superior II entered receivership, at which time Cadence purchased Superior II from the FDIC, as its receiver. Superior was thus acquired by and merged with Cadence.

In December 2011, despite their earlier demands for arbitration and their agreement to arbitrate, the Sloss defendants jointly sought the dismissal of case no. CV-10-903160 based on the trial court's alleged lack of subject-matter jurisdiction. More specifically, they contended that

---

[8]Second Avenue, according to Goodall-Brown, was organized in September 2011 by the management and/or members of SREG and Sloss Goodall, purportedly "as part of an elaborate scheme for defendants to 'buy' their way out of the fraud they committed on Goodall[-Brown]" and/or to "obtain the [Goodall-Brown] building for far less than the option price in the ... [l]ease." Further, also according to Goodall-Brown, before forming Second Avenue, SREG and Sloss Goodall purposely defaulted on the lease payments in order to ensure Goodall-Brown's resulting default on the note. Goodall-Brown amended its original complaint in case no. CV-10-903160 to add additional factual allegations and claims related to the formation of Second Avenue and the alleged tortious conduct of the Sloss defendants.

1111422; 1111449; 1111526; 1121455; 1130054

Goodall-Brown lacked "standing" to prosecute the litigation because, they argued, it had assigned away its interest in the note and the mortgage, including all claims arising under those documents, to The Bank. At or around that same time, Goodall-Brown allegedly filed a supplemental demand for arbitration with the arbitrators seeking to include Cadence and Second Avenue in the arbitration proceedings ordered by the trial court in case no. CV-10-903160 in order that Goodall-Brown might challenge the validity of the underlying foreclosure.[9] The Sloss defendants later added, as additional support for their contention that the trial court lacked jurisdiction, the claim that the personal bankruptcy filing of Latimer, GBM's sole remaining member, resulted in the

---

[9]This attempt to include Cadence in the pending arbitration proceedings was apparently premised on Goodall-Brown's belief that Cadence, one of its previous lenders, was, based on the contents of the loan documents, both a party to the lease and guilty of tortious conduct in connection with the administration of Goodall-Brown's mortgage. Goodall-Brown explains the rationale for this decision as follows:

> "Goodall[-Brown] maintained that Cadence and Second Avenue were subject to the arbitration provision in the [lease], and addenda thereto, by virtue of being successors in interest to Superior ... and having assumed the position of 'Owner' in the [lease] by virtue of the Attornment Agreement."

Goodall-Brown's brief, at pp. 3-4.

1111422; 1111449; 1111526; 1121455; 1130054

dissolution of GBM and that Goodall-Brown's default and the resulting foreclosure also terminated any standing that Goodall-Brown previously possessed with regard to claims stemming from the Goodall-Brown Building, i.e., "the lawsuit is being prosecuted and managed by a nonexistent former general partner of [Goodall-Brown] who has no authority to act on behalf of the entity."[10]

Also in December 2011, Second Avenue initiated an adversary proceeding in Latimer's bankruptcy case seeking to except from Latimer's bankruptcy discharge a debt allegedly owed by him to Second Avenue in connection with his purported conversion of rents allegedly due Superior II, from which Second Avenue obtained its interest in the note.

Second Avenue subsequently foreclosed and ultimately purchased the Goodall-Brown Building at the foreclosure sale conducted on January 3, 2012.

In February 2012, Cadence sued Goodall-Brown in the trial court, seeking declaratory and injunctive relief (case no. CV-12-900435).[11] More specifically, Cadence sought a declaration

---

[10]See § 10A-5-6.06(b)(1), Ala. Code 1975.

[11]Cadence subsequently amended its complaint in case no. CV-12-900435 to add the American Arbitration Association ("the

12

1111422; 1111449; 1111526; 1121455; 1130054

from the trial court that it was not a party to and had not succeeded to Goodall-Brown's interest under the lease and was not, therefore, required to submit to arbitration; Cadence also sought an injunction preventing Goodall-Brown from proceeding in arbitration against it. At Cadence's request, and upon the agreement of all parties, the trial court consolidated Cadence's declaratory-judgment action (case no. CV-12-900435) with case no. CV-10-903160.

Goodall-Brown later asked that the trial court also order that the individual defendants named in case no. CV-10-903160 be required to participate in the arbitration proceedings on the ground, among others, that conspiracy claims and efforts to pierce the corporate veils of SREG and Sloss Goodall, which Goodall-Brown was pursuing in arbitration, were necessarily intertwined with Goodall-Brown's claims against the individual defendants. In conjunction with that request, and in an alleged attempt to corral the parties' various claims into a single forum and to eliminate the potential for inconsistent results, Goodall-Brown also requested that the bankruptcy court before which Latimer's bankruptcy was pending stay the

AAA") as a defendant; however, Cadence later stipulated to the dismissal of the AAA.

13

1111422; 1111449; 1111526; 1121455; 1130054

adversary proceeding initiated against Latimer by Second Avenue and compel Second Avenue to participate in the arbitration ordered by the trial court.

Thereafter, upon the motion of Goodall-Brown, the trial court, in July 2012, denied Cadence's request for injunctive relief and stayed case no. CV-12-900435 based on its alternative conclusions that the question of arbitrability was for the arbitrators to determine, pursuant to the incorporation into the lease of the Rules of the American Arbitration Association ("the AAA"), or that Cadence was subject to the arbitration provision in the lease pursuant to both the plain language of the mortgage or of the attornment agreement. More specifically, as to its alternative holding that Cadence was, in fact, bound to arbitrate, the trial court held as follows:

> "Second, and alternatively, if this Court is the proper forum to decide questions of arbitrability, then there is substantial evidence that Cadence is subject to the terms of the [lease] and the arbitration agreement set forth within it. The Federal Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983). There is undisputed evidence of several lending documents which tie Cadence to the [lease]. Each will be discussed in turn.

14

1111422; 1111449; 1111526; 1121455; 1130054

"A. The Mortgage.

"Cadence concedes in paragraph 9 of its Complaint that the December 31, 2001, Future Advance Mortgage, Assignment of Rents and Leases and Security Agreement (the 'Mortgage') included an absolute and present assignment and transfer of all rents and leases, including future leases (such as the [lease]):[5]

"The operative provisions provide as follows:

"'2.01 Assignment. Borrower, in consideration of Lender's making the Loan as aforesaid and for other good and valuable consideration, ... does hereby sell, assign and transfer unto the Lender all leases, subleases and lease guaranties of or relating to all or part of the Mortgaged Property, whether now existing or hereinafter created or arising, including without limitation those certain leases, if any, specifically described on an exhibit to this Mortgage....

"'....

"'2.04 Present Assignment. It is the intention of the parties that this assignment of rents and leases shall be a present assignment....

"'....

"'2.06 Instruction to Lessees. The Borrower does further specifically authorize and instruct each and every present and future lessee, tenant, sublessee or subtenant of the whole or any part of the Mortgaged Property to pay all unpaid rental agreed upon in any lease, sublease or tenancy to the Lender upon

15

1111422; 1111449; 1111526; 1121455; 1130054

receipt of demand from said Lender to pay the same.

"'2.07. Default (Assignment). Upon the occurrence of any Event of Default, as described in Paragraph 4.01 of this Mortgage, then, in addition to the right to demand and collect directly from tenants rents accruing from leases of the Mortgaged Property, Lender shall have all rights and remedies set forth in Article IV or elsewhere in this Mortgage....

"'....

"'4.03 Right of Lender to Enter and Take Possession.

"'....

"'(b) (iii) [The Lender has the right to] manage and operate the Mortgaged Property (or any portion thereof selected by Lender) and exercise all the rights and powers of the Borrower in its name or otherwise, with respect to the same, including legal actions for the recovery of rent, legal dispossessory actions against tenants holding over and legal actions in distress of rent, and with full power and authority to cancel or terminate any lease or sublease for any cause or on any ground which would entitle the Borrower to cancel the same, and to elect to disaffirm any lease or sublease made subsequent to this Mortgage or subordinated to the lien hereof....'

"(Mortgage, Cadence Complaint, Exhibit B, pp. 8-11.)

"Thus, the provisions of the Mortgage grant the lender ... a present Assignment of rights under every present and future lease, which must

16

necessarily include the [lease]. Importantly, the lender's rights under the [lease] are not contingent upon a default; rather, the Mortgage evidences a <u>present</u> assignment of rights whereby the lender has standing immediately as an assignee of any lease. The Mortgage provides that any assignee of the mortgage (such as Cadence) is subject to the Mortgage and related documents, including the [lease]:[6]

> "'5.01 Binding Effect. Wherever in this Mortgage one of the parties hereto is named or referred to, the heirs, administrators, executors, successors, assigns, distributes [sic], and legal and personal representatives of such party shall be included, and all covenants and agreements contained in this Mortgage by or on behalf of the Borrower or by or on behalf of Lender shall bind and inure to the benefit of their respective heirs, administrators, executors, successors, assigns, distributes [sic], and legal and personal representatives, whether so expressed or not.'

"(Mortgage, Cadence Complaint, Exhibit B, p. 14.) As such, Cadence is an assignee of the Mortgage and is likewise subject to the [lease].

"B. The Attornment Agreement.

"In paragraph 12 of its Complaint, Cadence concedes that it entered into a separate Attornment Agreement with [SREG]:

> "'The Borrower, the Tenant and Superior Bank, a federal savings bank (the 'Former Bank'), executed a subordination, non-disturbance and attornment agreement dated November 20, 2006....'

17

1111422; 1111449; 1111526; 1121455; 1130054

"The Attornment Agreement gave the mortgagee/lender and the tenants -- [SREG] and [Sloss Goodall] -- a direct contractual relationship:

"'1. LESSEE TO ATTORN TO MORTGAGE. ...

"'....

"'(b)   In the event that the Mortgagee shall succeed to the interest of Owner under such Lease, the Lease shall continue with the same force and effect as if the Mortgagee, as Lessor, and the Lessee had entered into a Lease for a term equal to the then unexpired term of the Lease..., and the Lessee hereby attorns and agrees to attorn to the Mortgagee as its Landlord, such attornment to be effective and self operative without the execution of any further instruments on the part of either of the parties hereto immediately upon the succession of Mortgagee to the interest of Owner under the Lease.... The respective rights and obligations of the Lessee and the Mortgagee upon such attornment and their relationship shall be as tenant and landlord respectively, for the remaining term of the Lease, including any renewal periods set forth in said Lease....'

"(Attornment Agreement, Cadence Complaint, Exhibit D, p. 2.) The Attornment Agreement provides in paragraph 8 that it applies to any successors and assigns (including Cadence):

"'This Agreement shall bind and inure to the benefit of the parties hereto, their successors and assigns.  As used herein, (a) the term "Lessee" shall include any subtenant, successors and/or assigns of Lessee named herein; ... (c) the word "Mortgagee" shall include the Mortgagee specifically named and any successors and

18

<u>assigns and shall include anyone or any entity who shall have succeeded to Owner's interest in the Leased Premises by, through or under foreclosure of the Mortgage or as a result of any other means</u>.'

"(Attornment Agreement, Cadence Complaint, Exhibit D, p. 4.)

"The Attornment Agreement is actually a 3-party agreement, which links Goodall[-Brown] (the Owner) to [SREG] (the Tenant) and the lender and its successors (Cadence):

"'APPROVALS. The Owner has joined in this Agreement for the purpose of expressing its consent and agreement to be bound by the provisions of Paragraph 1(b) and Paragraph 4 hereof.'

"<u>Id.</u>

"C. The Eighth Amendment.

"On August 5, 2010, the lender and Goodall[-Brown] executed the Eighth Amendment by which the lender succeeded to the interest of Goodall[-Brown] under the [lease]. In regard to the Sloss [defendants'] Default, the Eighth Amendment provides in paragraph 4 as follows:

"'[The] Sloss [defendants have] ceased paying rent and [have] requested an adjustment to the terms of the [lease]. [Goodall-Brown] and [the] Sloss [defendants] have conducted negotiations on a modification of the [lease] to resolve the default by [the] Sloss [defendants], but no agreement has been reached by the parties thereto, and the [lease] remains in default (the "Sloss Default"). The Sloss Default is an Event of Default under the Loan Agreement.'

19

"(Eighth Amendment, Cadence Complaint, Exhibit A, p. 3.)

"The language of the Attornment Agreement, when combined with the Eighth Amendment, establishes that the lender becomes the 'Landlord' under the [lease] when 'an Event of Default under the Mortgage, the Assignment of Rents and Leases or other mortgage loan documents has occurred.' When [the] Sloss [defendants] stopped making rent payments in December of 2009, this was an 'event of default under the Loan Agreement.' (Promissory Note, Cadence Complaint, Exhibit A, p. 3, ¶ 6.) Consequently, when the Sloss [defendants'] Default occurred in December 2009, it was an 'Event of Default under the Loan Agreement' that then triggered the operation of the attornment provision of the Attornment Agreement which, in turn, made the lender -- now the Landlord -- a direct party to the [lease]. The [lease] includes an arbitration agreement, and Cadence is subject to that agreement.

_____

"[5]It is undisputed that the [lease] was pledged as additional security for the loan from Cadence's predecessor in interest and was added to the loan documents by the October 31, 2006, Seventh Amendment to the Loan Documents. (Seventh Amendment, Cadence Complaint, Exhibit A.)

"[6]The [lease] provides that it applies to any successor of the original Landlord, Goodall[-Brown]: 'this Lease shall inure to the benefit of and be binding upon Landlord and Tenant and their respective heirs, executors, legal representatives, successors and assigns....' (See the [lease], Cadence's Complaint, Exhibit C, pp. 34, ¶ 14.12.)"

(Some emphasis added; footnotes 7 and 8 omitted.) Cadence appeals from that decision (case no. 1111422).

1111422; 1111449; 1111526; 1121455; 1130054

Additionally, by separate orders, the trial court granted Goodall-Brown's motion seeking to also compel the individual defendants to arbitration and further concluded that the Sloss defendants' motions based on the trial court's alleged lack of subject-matter jurisdiction were "moot" in light of its June 2011 and July 2012 arbitration orders. The Sloss defendants also appeal (case no. 1111449). In addition, the Sloss defendants filed the above-described petition for a writ of mandamus (case no. 1111526) seeking relief from the trial court's decision; this Court subsequently ordered answers and briefs to that petition.

Thereafter, Goodall-Brown again amended its complaint to add to the pending litigation in case no. CV-10-903160 claims against Second Avenue and Cadence, including, among others, its "veil-piercing," wrongful-foreclosure, conspiracy, and fraud-based claims.[12] It further filed, in that action, a new

---

[12]According to Goodall-Brown, this amendment added claims that Goodall-Brown had previously been pursuing solely in arbitration in an effort to dispel any future argument that its claims against the added defendants were barred by the applicable statutes of limitations. See Porter v. Colonial Life & Accident Ins. Co., 828 So. 2d 907, 908 (Ala. 2002) ("If a plaintiff's court action be dismissed to enforce an arbitration agreement, but, through no fault of the plaintiff's, the arbitration be not concluded or some of the plaintiff's claims be not arbitrated, a statute of limitations

21

1111422; 1111449; 1111526; 1121455; 1130054

motion to compel SREC to participate in the already pending arbitration proceedings. Subsequent to its inclusion as a defendant, Second Avenue, incorporating the prior pleadings of the other named defendants in this regard, both moved to dismiss the consolidated litigation on the ground that Goodall-Brown lacked standing and sought a motion to stay the pending arbitration proceedings as to Second Avenue.

At the request of SREG and Sloss Goodall in case no. 1111449, this Court entered an order staying the arbitration proceedings as to those parties pending the outcome of these appeals and petition; however, by subsequent order clarifying, at the request of the parties, our stay ruling, this Court specifically declined to stay proceedings against Second Avenue on the ground asserted by the parties that Second Avenue was not a party to the underlying proceeding at the time the appeals in case no. 1111422 and case no. 1111449 were filed and was, therefore, not properly before this Court.

In March 2013, the bankruptcy court entered a memorandum opinion and corresponding order staying Second Avenue's

could bar a refiling of the unarbitrated claims in court."). It, therefore, requested that the trial court extend its previous order staying the litigation to include its second amended complaint.

22

1111422; 1111449; 1111526; 1121455; 1130054

adversary proceeding against Latimer until the conclusion of the state-court arbitration based on its conclusion that "Second Avenue is subject to the arbitration provision in the lease as a result of the automatic assignment of leases provision in the security agreement."

On September 11, 2013, at the request of Second Avenue, the trial court entered, in light of the pending appeals described above, an order preliminarily enjoining the scheduled arbitration proceeding set for October 28, 2013, and the collection of prehearing fees associated therewith; however, the trial court's order permitted the continuation of "[a]ll other aspects" of the arbitration proceeding, including discovery in accordance with the schedule previously established by the AAA. Second Avenue has appealed that order to this Court (case no. 1121455). Goodall-Brown, however, sought clarification as to the trial court's September 11 order. More specifically, Goodall-Brown sought an explanation from the trial court as to whether the injunction with respect to the fee payment applied solely to fees associated with an October 28 final hearing and not to fees associated with prehearing discovery and/or any other aspect of the proceeding. Following Second Avenue's initial appeal, and

23

1111422; 1111449; 1111526; 1121455; 1130054

Second Avenue's renewed request for injunctive relief, the trial court purported to enter two subsequent orders amending its September 11, 2013, order; each amended order reiterated the trial court's refusal to, as requested by Second Avenue, enjoin discovery in the arbitration proceedings. In response to the trial court's amended orders, Second Avenue filed a second notice of appeal (case no. 1130054). Thereafter, this Court granted Second Avenue's motion to stay discovery in the arbitration proceedings.

## I.  Case No. 1111422

In case no. 1111422, Cadence appeals from the trial court's orders staying case no. CV-12-900435 and refusing Cadence's request for injunctive relief to prevent Goodall-Brown from proceeding against it in arbitration -- thus, in effect, compelling Cadence to arbitrate.[13]  Cadence contends

_____

[13]Although Goodall-Brown contends that the trial court's order was not "[a]n order granting or denying a motion to compel arbitration" from which an appeal will lie pursuant to Rule 4(d), Ala. R. App. P., we disagree.  As Cadence notes, although styled as a request for injunctive relief, the denial of Cadence's motion effectively compelled Cadence to arbitration with the remaining parties.  In a sense, Cadence preempted a motion to compel arbitration by first filing a declaratory-judgment action seeking to determine whether it was required to arbitrate.  Moreover, as set out above, the trial court's order concluded, alternatively, that Cadence was subject to the arbitration provision in the lease. Further, as

24

1111422; 1111449; 1111526; 1121455; 1130054

that the trial court's rulings were in error because, it maintains, it is not a signatory to any document containing an agreement to arbitrate and because the assignment pursuant to which it assumed certain rights under the lease specifically excluded the corresponding assumption of duties or obligations enumerated in the lease.

Although the trial court's ruling was not in response to a formal motion to compel arbitration, see note 13, supra, our traditional standard of review in such scenarios is appropriate:

> "'[T]he standard of review of a trial court's ruling on a motion to compel arbitration at the instance of <u>either party</u> is a <u>de novo</u> determination of whether the trial judge erred on a factual or

---

Cadence also argues, even if, as Goodall-Brown contends, the trial court's order staying case no. CV-12-900435 was insufficient to sustain the present appeal, its related order denying Cadence's accompanying request for injunctive relief is sufficient to support the present appeal under our rules. See Rule 4(a)(1)(A), Ala. R. App. P. (providing for an appeal as of right to our appellate courts "from ... any interlocutory order granting, continuing, modifying, refusing, or dissolving an injunction"). Finally, even assuming, as Goodall-Brown argues in response to Cadence's claims in this regard, that the appropriate vehicle for consideration of Cadence's arguments is a petition for a writ of mandamus, and not a direct appeal, it is well established that this Court possesses the inherent authority to treat Cadence's notice of appeal as a petition for a writ of mandamus. See, generally, <u>F.L. Crane & Sons, Inc. v. Malouf Constr. Corp.</u>, 953 So. 2d 366, 372 (Ala. 2006).

legal issue to the substantial prejudice of the party seeking review.' Ex parte Roberson, 749 So. 2d 441, 446 (Ala. 1999). Furthermore:

> "'A motion to compel arbitration is analogous to a motion for summary judgment. TranSouth Fin. Corp. v. Bell, 739 So. 2d 1110, 1114 (Ala. 1999). The party seeking to compel arbitration has the burden of proving the existence of a contract calling for arbitration and proving that that contract evidences a transaction affecting interstate commerce. Id. "After a motion to compel arbitration has been made and supported, the burden is on the non-movant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question."'
>
> "Fleetwood Enters., Inc. v. Bruno, 784 So. 2d 277, 280 (Ala. 2000) (quoting Jim Burke Auto., Inc. v. Beavers, 674 So. 2d 1260, 1265 n. 1 (Ala. 1995) (emphasis omitted))."

Vann v. First Cmty. Credit Corp., 834 So. 2d 751, 752-53 (Ala. 2002).

Goodall-Brown met its burden of producing a contract calling for arbitration.[14] On appeal, Cadence presents arguments as to why the arbitration provision allegedly does

---

[14]There appears to be no dispute among the parties that the contract at issue "'"evidences a transaction affecting interstate commerce."'" Vann, 834 So. 2d at 753 (quoting Fleetwood Enters., 784 So. 2d at 280).

1111422; 1111449; 1111526; 1121455; 1130054

not apply in its case.[15]  Specifically, it argues that it did not "sign" the lease, which contains the arbitration clause. Cadence also contends that the arbitration provision is narrow in that it specifically limits the obligation to arbitrate to "the parties" to the lease, i.e., Goodall-Brown and SREG.  See note 3, supra.

The trial court held that the mortgage "provide[d] that any assignee of the mortgage (such as Cadence) is subject to the Mortgage and related documents, including the [lease]," and thus "Cadence is an assignee of the Mortgage and is likewise subject to the [lease]."[16]  Further, the attornment agreement "gave the mortgagee/lender and the tenants -- [SREG] and [Sloss Goodall] -- a direct contractual relationship" and applied "to any successors and assigns (including Cadence)." Further, the trial court held that the attornment agreement was "actually a 3-party agreement, which links Goodall[-Brown] (the Owner) to [SREG] (the Tenant) and the lender and its

---

[15]Cadence makes no contention that the provision itself is invalid.

[16]The trial court stated, as indicated above, that Cadence conceded in its complaint that the "Future Advance Mortgage, Assignment of Rents and Leases and Security Agreement" included an assignment of all rents and leases.

27

successors (Cadence)."[17] Additionally, the trial court held that, under the eighth amendment to the loan documents, the "lender" succeeded to the interests of Goodall-Brown under the lease.

When the Sloss defendants defaulted in December 2009, the trial court held, the "lender" became the landlord under the lease. At that time, Superior was the "lender" and thus a direct party to the lease, which contained the arbitration provision. The mortgage ultimately passed to Superior II, which retained the status of "lender." Superior II then sold the note to Second Avenue and later merged with Cadence. Although Cadence, as it existed <u>before</u> the merger with Superior II, had never held the mortgage and its related agreements, Goodall-Brown's claims against Cadence arise out of the actions of Superior II, <u>which has now merged with Cadence</u>. Cadence, of course, never "signed" a contract containing an arbitration agreement; instead, through Superior II, it <u>bought</u> the note and its attendant rights and obligations. Superior II is now Cadence; Cadence stands in the shoes of Superior II. <u>Atlantic Nat'l Trust, LLC v.</u>

---

[17]The final "lender" in this case is Second Avenue.

McNamee, 984 So. 2d 375, 378 (Ala. 2007) ("Under Alabama common law, '[a] valid assignment gives the assignee the same rights, benefits, and remedies that the assignor possesses,' such that the assignee 'simply steps into the shoes of the assignor ....'" (quoting Nissan Motor Acceptance Corp. v. Ross, 703 So. 2d 324, 326 (Ala. 1997))). Cadence's claim that it was not a signatory to the lease is without merit.

Cadence also contends that the assignment provision in the mortgage clearly excepted from assignment any obligations or duties arising under the lease.[18] Specifically, Cadence contends that section 2.05 of the mortgage recites that Cadence accepted no "duties" under any lease. That provision states:

> "No Obligation of Lender Under Leases. The Lender shall not be obligated to perform or discharge, nor does it hereby undertake to perform or discharge, any obligation, duty or liability under any leases, subleases or rental agreements relating to the Mortgaged Property, and the Borrower shall and does hereby agree to indemnify and hold the Lender harmless of and from any and all liability, loss or damage which it may or might incur under any leases, subleases or agreements or under or by reason of the

---

[18]This Court presumes, as set out in some of the authorities Cadence identifies, that this provision was aimed at avoiding "'mak[ing] [the lender] responsible for fixing roofs, unclogging drains, and other obligations of landlords.'" Cadence's reply brief, at p. 20 n.8.

> assignment thereof and of and from any and all claims and demands whatsoever which may be asserted against it by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in said leases, subleases or agreements. ..."

The language of this provision appears to relate to obligations to <u>perform</u> under any lease the buyer might enter into, not a disclaimer of any portion of a lease later assigned to the lender that the lender might characterize as an obligation or duty.  In any event, as Goodall-Brown argues, the subsequently executed attornment agreement provides that the lender "agrees to be bound to the Lessee under <u>all of the terms, covenants and conditions of the Lease</u>...." (Emphasis added.)

Cadence also argues that because it did not foreclose on the Goodall-Brown Building, it did not succeed to Goodall-Brown's interest under the attornment agreement. That agreement, however, does not limit succession merely to instances of foreclosure.  Instead, it provides that the lender also could have assumed Goodall-Brown's role as owner and landlord "under foreclosure of the Mortgage <u>or as a result of any other means</u>," presumably including Goodall-Brown's default.  As set out in the trial court's order and quoted

30

1111422; 1111449; 1111526; 1121455; 1130054

above, the original assignment executed by Goodall-Brown specifically provided Cadence's predecessor in interest the right to assume management and operation of the Goodall-Brown Building upon Goodall-Brown's default. It is undisputed that the assignment inured to the benefit of the original lender's successors and assigns, such as Superior II. Further, according to the trial court's order, the subsequently executed lease was specifically incorporated into and made a part of the mortgage.

The record establishes that, in 2011, Superior II, Cadence's predecessor, acted on those assigned rights when it provided notice to Goodall-Brown and to then tenants of the Goodall-Brown Building of Goodall-Brown's default and of its intent to exercise its rights under the loan documents to seize rental payments due Goodall-Brown from tenants pursuant to extant lease agreements. Thus, as a direct result of Goodall-Brown's default and triggering of the assignment and attornment agreement,[19] "Cadence [(Superior II)] was the lender

_____

[19]According to the definition included in Cadence's brief and in the trial court's order compelling Cadence to arbitrate, the term "attorn" is defined as follows: "'To agree to become tenant to one as owner or landlord of an estate previously held of another, or to agree to recognize a new owner of a property or estate and promise payment of rent to

31

1111422; 1111449; 1111526; 1121455; 1130054

and ... the new, temporary landlord." Therefore, as Goodall-Brown argues, even if the application of the arbitration provision is limited specifically to parties to the lease, when Superior II--now Cadence--obtained the defaulted mortgage, it stepped into the shoes of Goodall-Brown as the original landlord. <u>Atlantic Nat'l Trust, LLC</u>, supra. The assignment did, then, despite Cadence's claims to the contrary, make Cadence, through Superior II, a party to the lease.[20] Therefore, in case no. 1111422, we affirm the trial court's judgment as to Cadence.

<u>II. Cases No. 1111449 and No. 1111526</u>

In case no. 1111526, the Sloss defendants petition for a writ of mandamus directing the trial court to dismiss the underlying litigation in case no. CV-10-903160 based on its alleged lack of subject-matter jurisdiction. In case no.

---

him.'" Cadence's brief, at p. 23 n.10 (quoting <u>Black's Law Dictionary</u> 128 (6th. ed. 1990)).

[20]Because of our disposition of this claim, we pretermit discussion of the remaining issue raised by Cadence on appeal, namely that the trial court erred in denying Cadence's request for a permanent injunction barring Goodall-Brown from proceeding against it in arbitration. See <u>Favorite Market Store v. Waldrop</u>, 924 So. 2d 719, 723 (Ala. Civ. App. 2005) (stating that the court would pretermit discussion of further issues in light of the dispositive nature of another issue).

32

1111422; 1111449; 1111526; 1121455; 1130054

1111449, they seek essentially the same relief in that they purport to collectively appeal from the trial court's June 24, 2011, order mooting their motions to dismiss.[21]  See LaConsay v. Langley, 13 So. 3d 989, 991-92 (Ala. Civ. App. 2009) ("A ruling that an issue is moot is not an adjudication on the merits and is not a final judgment on the pending issue." (citing Ferguson v. Commercial Bank, 578 So. 2d 1234, 1236-37 (Ala. 1991))).  Because "[t]he question of subject-matter jurisdiction is reviewable by a petition for a writ of mandamus," we dismiss the appeal in case no. 1111449 and proceed to consideration of the merits of their petition seeking a writ of mandamus.  Ex parte Liberty Nat'l Life Ins. Co., 888 So. 2d 478, 480 (Ala. 2003).  See also Ex parte Johnson, 993 So. 2d 875, 881 (Ala. 2008) ("Although the normal

---

[21]To the extent that, in that same order, the trial court also granted Goodall-Brown's motion to compel the individual defendants to join the previously ordered arbitration, that order would clearly have supported a challenge on direct appeal by the individual defendants.  See Rule 4(d), Ala. R. App. P. ("An order granting or denying a motion to compel arbitration is appealable as a matter of right ...."). However, the Sloss defendants' filings in case no. 1111449 make clear that they are proceeding only with their standing-based challenge on appeal.  The individual defendants make no argument concerning the actual merits of the trial court's order compelling them to arbitrate.

33

1111422; 1111449; 1111526; 1121455; 1130054

basis upon which this Court reviews orders granting or denying arbitration is by way of direct appeal, see Rule 4(d), Ala. R. App. P., in this proceeding, the homeowners' contention that the trial court lacks subject-matter jurisdiction is appropriately reviewed by way of a petition for a writ of mandamus.").

## Standard of Review

> "'The writ of mandamus is a drastic and extraordinary writ, to be "issued only when there is: 1) a clear legal right in the petitioner to the order sought; 2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; 3) the lack of another adequate remedy; and 4) properly invoked jurisdiction of the court." Ex parte United Serv. Stations, Inc., 628 So. 2d 501, 503 (Ala. 1993); see also Ex parte Ziglar, 669 So. 2d 133, 134 (Ala. 1995).' Ex parte Carter, [807 So. 2d 534,] 536 [(Ala. 2001)]."

Ex parte McWilliams, 812 So. 2d 318, 321 (Ala. 2001). "Mandamus review is available where the petitioner challenges the subject-matter jurisdiction of the trial court based on the plaintiff's alleged lack of standing to bring the lawsuit." Ex parte HealthSouth Corp., 974 So. 2d 288, 292 (Ala. 2007).

## Discussion

The Sloss defendants contend in their petition that Goodall-Brown lacked the requisite "standing" to initiate the

34

1111422; 1111449; 1111526; 1121455; 1130054

underlying litigation in case no. CV-10-903160 in the trial court, pursuant to which the Sloss defendants were ultimately ordered to arbitration. See, e.g., State v. Property at 2018 Rainbow Drive, 740 So. 2d 1025, 1028 (Ala. 1999) ("When a party without standing purports to commence an action, the trial court acquires no subject-matter jurisdiction."). The Sloss defendants explain in their petition that they base this claim on the fact that, before it initiated the underlying litigation based on the lease transaction, Goodall-Brown purportedly had assigned away all of its rights and interest in the lease to a third party -- Goodall-Brown's original lender, The Bank. Additionally, the Sloss defendants contend that, as a result of Latimer's personal-bankruptcy filing, GBM was dissolved and "the [underlying] lawsuit is being prosecuted and managed by a nonexistent former general partner without authority to act on behalf of the plaintiff." Petition, at p. 8. Assuming, without deciding, that the Sloss defendants' contention is, in fact, a challenge to Goodall-Brown's "standing" and not a claim that Goodall-Brown is not the proper party in interest to pursue the claims asserted by Goodall-Brown in the underlying litigation, see, e.g., Ex

35

1111422; 1111449; 1111526; 1121455; 1130054

parte MERSCORP, Inc., 141 So. 3d 984 (Ala. 2013), both grounds are, nonetheless, meritless.[22]

We first address the second of the Sloss defendants' claims. The Sloss defendants note that pursuant to Goodall-

---

[22]By addressing this argument as presented by the parties, and assuming, without deciding, that the Sloss defendants' contention is a challenge to Goodall-Brown's "standing," this Court is in no way signaling a retreat from our recent caselaw clearly "reject[ing] the notion that questions ... regarding the cognizability of the plaintiffs' legal theories, or claims, are 'standing' issues rather than 'cause of action' issues." Ex parte MERSCORP, 141 So. 3d at 992. "This Court has recently noted: '[T]he concept [of standing] appears to have no necessary role to play in respect to private-law actions, which, unlike public cases ..., come with established elements that define an adversarial relationship and "controversy" sufficient to justify judicial intervention.'" Poiroux v. Rich, [Ms. 1120734, March 14, 2014] ___ So. 3d ___, ___ (Ala. 2014) (quoting Ex parte BAC Home Loans Servicing, LP, [Ms. 1110373, September 13, 2013] ___ So. 3d ___, ___ (Ala. 2013)). Further,

> "[i]n private-law actions (e.g., a claim of negligence ...), if the elements are met, the plaintiff is entitled to judicial intervention; if they are not met, then the plaintiff is not entitled to judicial intervention. Everything necessary to justify judicial intervention, by definition, inheres in those elements that we say constitute a 'cause of action' in and by our courts. ... At a very fundamental level, the concept of standing is already embodied in the various elements prescribed, including the common requirement of proof of a sufficient existing or threatened injury."

Ex parte BAC, ___ So. 3d at ___. See also Wyeth, Inc. v. Blue Cross & Blue Shield of Alabama, 42 So. 3d 1216, 1220 (Ala. 2010).

36

Brown's partnership agreement, a co-general partner's interest terminates immediately upon the dissolution of that general partner. It is, as they argue, undisputed that GBM, which is owned solely by Latimer, is one of two co-general partners of Goodall Brown. The Sloss defendants further cite GBM's operating agreement, which provides that a member's ownership interest in GBM is terminated upon the filing of a bankruptcy petition, and the undisputed fact that Latimer, the sole owner and member of GBM, personally filed for bankruptcy protection. Thus, they argue that pursuant to the terms of the GBM operating agreement, Latimer's ownership interest in GBM was terminated as a result of his bankruptcy filing; that termination of the membership interest of its sole member dissolved GBM as a matter of law; and that GBM's dissolution automatically terminated its partnership interest in Goodall-Brown.

Contrary to the claims of the Sloss defendants, however, and as Goodall-Brown argues in opposition, "[s]tanding is '"'[t]he requisite personal interest that must exist <u>at the commencement</u> of the litigation.'"'" <u>Cadle Co. v. Shabani</u>, 4 So. 3d 460, 462-63 (Ala. 2008) (emphasis added) (quoting <u>Pharmacia Corp. v. Suggs</u>, 932 So. 2d 95, 98 (Ala. 2005),

37

1111422; 1111449; 1111526; 1121455; 1130054 quoting in turn In re Allison G., 276 Conn. 146, 156, 883 A.2d 1226, 1231 (2005)). See also Bernals, Inc. v. Kessler-Greystone, LLC, 70 So. 3d 315, 319 (Ala. 2011). Here, Latimer's bankruptcy filing may, in fact, have had the effect of dissolving GBM, as the Sloss defendants claim. Regardless, however, the filing date of Latimer's bankruptcy did not occur until after the 2010 filing date of Goodall-Brown's complaint initiating case no. CV-10-903160. Thus, irrespective of Latimer's present interest in GBM or GBM's current legal status, it is undisputed that, at the time of commencement of the litigation, the alleged event of dissolution on which this particular claim is based had not yet occurred and, therefore, had not worked to deprive Goodall-Brown of standing as the Sloss defendants contend. Moreover, § 10A-9-8.03, Ala. Code 1975, provides, in pertinent part, that "a limited partnership continues after dissolution ... for the purpose of winding up its activities," including "prosecut[ing] and defend[ing] actions and proceedings, whether civil, criminal, or administrative ... , [and] settl[ing] disputes." There is, therefore, nothing suggesting that a party without standing purported to commence or to continue the underlying action. See Property at 2018 Rainbow Drive, supra.

38

1111422; 1111449; 1111526; 1121455; 1130054

We now turn to the Sloss defendants' claim that Goodall-Brown's assignment in connection with the construction loan originally obtained from The Bank constituted a transfer of all of Goodall-Brown's legally protected rights under the assigned leases and the mortgage. In support of their contentions in this regard, the Sloss defendants rely primarily on Associates of Selma, Inc. v. Whetstone, 628 So. 2d 578 (Ala. 1993). Whetstone involved the appeal of, among other claims, a deficiency judgment obtained by Whetstone against the corporate defendant to whom Whetstone had sold a trailer park. 628 So. 2d at 579. In connection with the sale, the defendant executed a note to Whetstone for a portion of the purchase price, which note was secured by a mortgage on the trailer park. Whetstone later assigned the note to Peoples Bank and Trust Company of Selma ("Peoples Bank") as collateral for a mortgage loan Whetstone obtained from Peoples Bank. The language of the assignment specifically included the transfer of "'all rights accrued or to accrue to [Whetstone] under said Mortgage.'" Id. Despite the assignment, Whetstone continued to collect the defendant's monthly rental payments, which he then remitted to Peoples Bank. Id. Thereafter, however, the defendant defaulted and

Peoples Bank foreclosed; Whetstone purchased the park at foreclosure, then successfully sued the defendant in the trial court to recover the deficiency balance remaining on the original purchase-money mortgage. Id.

On appeal, this Court considered the following issue:

"[W]hether Whetstone's assigning to [Peoples Bank] the note and mortgage executed by [the corporate defendant] to Whetstone operated to cut off Whetstone's right to sue for a deficiency following the default by Associates and the resulting foreclosure and sale by [Peoples Bank]."

Id. We ultimately answered that question in the affirmative based on the following rationale:

"The language of the assignment executed by Whetstone to the Bank is that of an <u>unconditional</u> or <u>unqualified</u> assignment; therefore, '[i]t is <u>a complete transfer of the whole thing granted or a completed transfer of the entire interest of [Whetstone] in the particular subject matter</u> [here, the note and mortgage executed by Associates].' 6A C.J.S. <u>Assignments</u> § 2, p. 591 (1975).

"Whetstone's unconditional assignment to the Bank was an unqualified transfer of Whetstone's interest in the note and mortgage executed by [the corporate defendant]; therefore, '[u]nless the assignment is void or otherwise invalid, [Whetstone lost] all right to control or enforce' the terms of the note and mortgage, 'and he has no right except as he may sue for the benefit of his assignee, to recover judgment on the claim, or to recover damages for breach of the contract assigned.' 6A C.J.S. <u>Assignments</u> § 96, p. 753 (1975)."

328 So. 2d at 579-80 (third emphasis added).

40

1111422; 1111449; 1111526; 1121455; 1130054

In the present case, pursuant to the plain language of the assignment included in Goodall-Brown's original mortgage, the parties intended that the assignment be "a present assignment." Nonetheless, that same agreement indisputably provided that Goodall-Brown retained the right to collect rents "so long as there exist[ed] no event of default" on Goodall-Brown's mortgage obligation. Thus, unlike the facts in Whetstone, here, despite the assignment, Goodall-Brown retained, as the original lessor, rights attendant to the assigned leases if and until it defaulted on the obligation secured by the leases.[23] See Chattanooga Sav. Bank v. Crawford, 206 Ala. 530, 532, 91 So. 316, 317 (1921) ("A general statement of the effect of an assignment as collateral security for a debt, in equity, is that it gives the assignee only a qualified interest in the assigned chose to the extent of 'the debt or liability secured, although the assignment is absolute on its face' ... and, when the debt for which the

---

[23]This fact also distinguishes the present case from Bernals, on which the Sloss defendants also rely in their petition. Specifically, in Bernals, we concluded that the party commencing the litigation, who was not a party to the lease agreement, lacked standing to sue. 70 So. 3d at 319.

41

1111422; 1111449; 1111526; 1121455; 1130054

collateral is given has been paid, the right to hold and enforce the same in equity ceases.").

The record suggests that, in or around 2008, the Sloss defendants reduced their rental payments to less than the agreed upon amount and that, in or around December 2009, they halted all lease payments but continued to collect rents from tenants who occupied the Goodall-Brown Building pursuant to sublease agreements. According to the petition, Goodall-Brown did not default until 2011. Petition, at 4.

We have previously observed that the concept of standing to sue turns upon the demonstration of an injury to a legally protected right held by the plaintiff:

> "Standing requires injury in fact. This Court stated in State v. Property at 2018 Rainbow Drive, 740 So. 2d 1025 (Ala. 1999):
>
> > "'Standing ... turns on "whether the party has been injured in fact and whether the injury is to a legally protected right." Romer v. Board of County Comm'rs of the County of Pueblo, 956 P.2d 566, 581 (Colo. 1998) (Kourlis, J., dissenting) (emphasis added [in Property at 2018 Rainbow Drive]). See also NAACP v. Town of East Haven, 892 F. Supp. 46 (D.Conn. 1995)....'
> >
> > "'....'
>
> "740 So. 2d at 1027-28.

"'If a named plaintiff has not been injured by the wrong alleged in the complaint, then no case or controversy is presented and the plaintiff has no standing to sue either on his own behalf or on behalf of a class.' Ex parte Prudential Ins. Co. of America, 721 So. 2d 1135, 1137 (Ala. 1998); see also Ex parte Blue Cross & Blue Shield of Alabama, 582 So. 2d 469, 474 (Ala. 1991). A party's injury must be 'tangible,' see Reid v. City of Birmingham, 274 Ala. 629, 639, 150 So. 2d 735, 744 (1963); and a party must have 'a concrete stake in the outcome of the court's decision.' Brown Mech. Contractors, Inc. v. Centennial Ins. Co., 431 So. 2d 932, 937 (Ala. 1983)."

Kid's Care, Inc. v. Alabama Dep't of Human Res., 843 So. 2d 164, 166-67 (Ala. 2002).

Here, whatever other rights and interests were assigned by Goodall-Brown, it clearly retained the right to collect rents from its tenants of the Goodall-Brown Building so long as it remained current on its mortgage obligation. In its complaint initiating case no. CV-10-903160, Goodall-Brown alleged that the Sloss defendants "failed to make payments [they were] contractually obligated [to make] under the terms of the [l]ease." Similarly, as the petition notes, Goodall-Brown's amended complaint also includes, among other theories of recovery, claims based on the Sloss defendants' alleged failure to make payments under the lease -- payments to which Goodall-Brown was contractually entitled before its mortgage

43

default –- and also alleges that during the time the Sloss defendants were not making payments due Goodall-Brown under the lease, they were converting rent moneys remitted by subtenants. Thus, Goodall-Brown has clearly alleged a discernible injury to a legally protected right, namely the Sloss defendants' purported interference with its right to collect rent moneys pursuant to tenant lease agreements.[24]

"A writ of mandamus is a drastic and extraordinary remedy, and to justify issuance of such a writ there must be <u>a clear showing of injury to the petitioner</u>." <u>Ex parte Thomas</u>, 628 So. 2d 483, 485 (Ala. 1993) (citing <u>Ex parte J.E.W.</u>, 608 So. 2d 728 (Ala. 1992) (emphasis added)). Because we conclude that there is sufficient evidence establishing Goodall-Brown's standing to initiate the underlying litigation, we must necessarily find that the Sloss defendants, the petitioners, have not made a sufficient showing of a clear legal right to the relief sought. We, therefore, deny their petition for a writ of mandamus.

---

[24]Under this same analysis, Goodall-Brown would similarly be the proper party in interest to pursue the unpaid-rent claim for the period before Goodall-Brown's mortgage default. See <u>MERSCORP, Inc.</u>, supra. See also <u>Ex parte Simpson</u>, 36 So. 3d 15, 24-25 (Ala. 2009).

1111422; 1111449; 1111526; 1121455; 1130054

### III.  Case No. 1121455 and Case No. 1130054

In case no. 1121455 and case no. 1130054, Second Avenue appeals from the orders of the trial court staying the pending arbitration proceedings as to Second Avenue but refusing to also enjoin the discovery process while these consolidated appeals remained pending.  Based on our resolution of case no. 1111422, above, any challenge to the trial court's refusal to stay the discovery process in the pending arbitration proceeding is moot.  See Ex parte Connors, 855 So. 2d 486, 488 (Ala. 2003) ("[I]f a case has become moot, or [if a] judgment would not accomplish an end recognized as sufficient in law, there is no necessity for the judgment, the court will decline to consider the merits, and [the court] will dismiss the case." (emphasis omitted)).  See also note 12, supra.  We, therefore, dismiss these two appeals -- case no. 1121455 and case no. 1130054.

1111422 -- AFFIRMED.

Stuart, Bolin, Parker, Main, Wise, and Bryan, JJ., concur.

Murdock, J., concurs in the result.

Moore, C.J., dissents.

45

1111422; 1111449; 1111526; 1121455; 1130054

1111449 -- APPEAL DISMISSED.

Moore, C.J., and Stuart, Bolin, Parker, Murdock, Wise, and Bryan, JJ., concur.

Main, J., concurs in the result.

1111526 -- PETITION DENIED.

Moore, C.J., and Stuart, Bolin, Parker, Wise, and Bryan, JJ., concur.

Murdock and Main, JJ., concur in the result.

1121455 -- APPEAL DISMISSED.

Moore, C.J., and Stuart, Bolin, Parker, Murdock, Main, Wise, and Bryan, JJ., concur.

1130054 -- APPEAL DISMISSED.

Moore, C.J., and Stuart, Bolin, Parker, Murdock, Main, Wise, and Bryan, JJ., concur.

1111422; 1111449; 1111526; 1121455; 1130054

MURDOCK, Justice (concurring in the result in case no. 1111422 and case no. 1111526).

As a general rule, a court's order denying a motion to dismiss or a motion for a summary judgment is not reviewable on appeal by way of a petition for a writ of mandamus. Ex parte Jackson, 780 So. 2d 681, 684 (Ala. 2000). As the main opinion notes, among the exceptions to this general rule are a trial court's order denying a motion to dismiss or a motion for a summary judgment where the basis for the motion is a purported lack of standing on the part of the plaintiff, which, in turn, gives rise to a question of subject-matter jurisdiction on the part of the trial court. ___ So. 3d at ___ (citing Ex parte Liberty Nat'l Life Ins. Co., 888 So. 2d 478, 480 (Ala. 2003)).

In the present case, the basis for the motion in question is the allegation by the Sloss defendants[25] that, "before it initiated the underlying litigation based on the lease transaction, Goodall-Brown [Associates, L.P.,] purportedly had

_____

[25]Because of the number of defendants defined in the main opinion as "the Sloss defendants," I am using that term as defined in the main opinion.

47

1111422; 1111449; 1111526; 1121455; 1130054

assigned away all of its rights and interest in the lease to a third party" and/or the fact, as alleged by the Sloss defendants, that "as a result of [Thomas] Latimer's personal-bankruptcy filing, [Goodall-Brown Management, L.L.C.,] was dissolved and 'the [underlying] lawsuit is being prosecuted and managed by a nonexistent former general partner without authority to act on behalf of the plaintiff.'" ___ So. 3d at ___. Consistent with the authorities cited in note 22 of the main opinion, these issues are not, in fact, standing issues but, instead, are issues that go either to the merits of the claims asserted by Goodall-Brown Associates (e.g., whether Goodall-Brown Associates can prove that, notwithstanding its assignment of certain rights under the lease agreement, it retained sufficient rights or interest in that agreement to be able to prove the elements of a breach-of-contract claim (and the elements of any other claims it may assert related to the lease agreement) or to the question of who is the real party in interest in this case. In any event, they are not properly framed as "standing" issues under this Court's recent precedents, and I would deny the petition for the writ of

48

1111422; 1111449; 1111526; 1121455; 1130054

mandamus on this basis alone without discussion of the elements of standing. Therefore, in case no. 1111526 I concur in the result.

I also concur in the result in case no. 1111422. As the main opinion observes: "'"[A] valid assignment gives the assignee the same rights, benefits, and remedies that the assignor possesses," such that the assignee "simply steps into the shoes of the assignor ...."'" ___ So. 3d at ___ (quoting Atlantic Nat'l Trust, LLC v. McNamee, 984 So. 2d 375, 378 (Ala. 2007), quoting in turn Nissan Motor Acceptance Corp. v. Ross, 703 So. 2d 324, 326 (Ala. 1997)). Here, there was an assignment of the mortgage from Superior Bank ("Superior I") to Superior Bank, N.A. ("Superior II"). In addition, however, it is the fact that there was a merger of Superior II and Cadence Bank, N.A. ("Cadence"), that ultimately subjects the resulting entity, which in this case retained the name "Cadence," to the alleged obligations and liabilities of Superior II arising from Superior II's actions before that merger. That is, I find apposite the principle that, "[a]s a general rule, a corporation formed by consolidation or merger

49

is responsible for the debts and liabilities of the constituent corporations, whether based on contractual or tort liability," 19 C.J.S. Corporations § 910 (2007) (footnote omitted), and that, therefore, "[l]iability may be imposed upon a successor corporation for the tortious conduct of its predecessor, if there has been a merger or consolidation," 19 C.J.S. Corporations § 913 (2007) (footnote omitted). This principle has been codified in the laws of Alabama governing corporations and, specifically, corporate mergers:

"(a) When a merger takes effect:

"....

"(3) The surviving corporation shall be responsible and liable for all the liabilities and obligations of each corporation party to the merger; and neither the rights of creditors nor any liens upon the property of any corporation party to the merger shall be impaired by the merger;

"(4) Any claim existing or action or proceeding pending by or against any corporation party to the merger may be prosecuted, or continued, as if the merger had not taken place, or the surviving corporation may be substituted in the action or proceeding for the corporation whose existence ceased ...."

Ala. Code 1975, § 10A-2-11.06.